UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**TAMMY LYNN SCOTT**,                                          Case No. 3:14-cv-01693-KI

                              Plaintiff,                        OPINION AND ORDER

        v.

**CAROLYN COLVIN, Acting
Commissioner of Social Security**,

                              Defendant.


        Merrill Schneider
        Schneider Kerr & Gibney Law Offices
        P.O. Box 14490
        Portland, Oregon 97293

                Attorney for Plaintiff

        Billy J. Williams
        Acting United States Attorney
        District of Oregon


Page 1 - OPINION AND ORDER

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, Oregon 97201-2902

Heather L. Griffith
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

KING, Judge:

Plaintiff Tammy Scott brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying her application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). I affirm the decision of the Commissioner.

## BACKGROUND

Scott protectively filed applications for DIB and SSI on May 6, 2010, alleging disability beginning January 1, 2004. Her date last insured was September 30, 2007. The applications were denied initially and upon reconsideration. After a timely request for a hearing, Scott, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on March 23, 2012.

On April 25, 2012, the ALJ issued a decision finding Scott not disabled within the meaning of the Act and therefore not entitled to benefits. The Appeals Council vacated the hearing decision and remanded the case to the ALJ to more thoroughly address the opinion of

Page 2 - OPINION AND ORDER

examining psychologist Jill Spendal, PsyD.  The ALJ held a second hearing on January 7, 2014,

and issued a second decision, dated January 30, 2014, again finding Scott not disabled within the

meaning of the Act and therefore not entitled to benefits.  That decision became the final decision

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

August 26, 2014.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits

to people who have contributed to the Social Security program and who suffer from a physical or

mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security

income benefits may be available to individuals who are age 65 or over, blind, or disabled, but

who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

cause death or to last for a continuous period of at least twelve months.  42 U.S.C.

§§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his

physical or mental impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for

determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is

carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  *Parra v.*

*Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746.

The claimant is entitled to disability benefits only if he is not able to perform other work.  20
C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance.  *Id.* (internal quotation omitted).  The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations.  *Id.*

## THE ALJ'S DECISION

The ALJ identified the following diagnoses as Scott's severe impairments:  degenerative disc disease of the lumbar spine; sarcoidosis; mediastinal and bilateral hilar lymphadenopathy; hepatic steatosis and cholethiasis, without evidence of cholecystitis; fibromyalgia; hypothyroidism; anxiety disorder; depressive disorder; and attention deficit hyperactivity disorder.  The ALJ also found that these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  Given these impairments, the ALJ found Scott capable of performing sedentary work with the following exceptions:  she can stand and walk two hours total in an eight-hour day; sit two hours at a time and six hours of eight; must avoid moderate exposure to dust, gases, and poor ventilation; should have only occasional public contact and no close co-

worker contact (no teamwork); and can perform simple, repetitive tasks consistent with unskilled work.

Given this residual functional capacity ("RFC"), the ALJ concluded Scott cannot perform her past relevant work, but can perform other work in the national economy such as addresser and surveillance systems monitor. Accordingly, the ALJ found Scott not disabled within the meaning of the Act.

## FACTS

Scott, age 36 at the time of her alleged disability onset, dropped out her junior year of high school. She has past work as a stock clerk and as lead staff in a residential group home. She stopped working due to a "mutual decision" with her employer and because she had just had a baby. Tr. 65.

Michael Chen, M.D., treated Scott from May 2004 until September 2008 for a variety of ailments, including depression, back pain, hip and hand pain, thyroid levels, and memory loss. In May 2004, Scott felt Celexa was improving her depression, and that she was able to "go[] to work/training without significant problems at this time." Tr. 377. When Scott first complained of back pain in December 2004, Dr. Chen prescribed Vicodin, back exercises and recommended heat. He continued to recommend the same treatment in May 2005. An x-ray of her lumbar spine was normal in June 2005, with mild spondylosis in her thoracic spine. Dr. Chen discontinued the Vicodin in November 2005. Scott did not complain about her back again until four months later, at which time Dr. Chen prescribed Vicodin again and ordered imaging to rule out disc disease. Her thoracic spine was normal with a mild annulus bulge at her lumbar spine. Scott conceded she needed to lose weight in May 2006, and admitted she had not started doing

her back exercises.  Dr. Chen referred Scott to a chiropractor.  She complained again of back pain in September 2006, but displayed a normal gait and station, and a full range of motion in all directions.  In December 2006, Scott's main complaint was increased mood swings– she was not taking her Nortriptyline consistently–and she reported improved joint and muscle pain.

When Dr. Chen treated her for a sinus infection in March 2007, Scott reported experiencing palpitations and "having issues with increased stress with school, work, and home and having difficulty juggling all of her requirements and responsibilities."  Tr. 404.  Dr. Chen prescribed Paxil.  Although she continued to report depression and anxiety, the Paxil was helping in June 2007.  Scott complained of body aches, fatigue, malaise, and lower back pain in January 2008, and Dr. Chen thought it was likely fibromyalgia.  He prescribed Nortriptyline again.  In June 2008, Scott informed Dr. Chen she had stopped taking the Nortriptyline as it did not work.  Dr. Chen commented that Scott "has failed to followup on numerous occasions" and "is sometimes inconsistent and noncompliant with treatments."  Tr. 410.  Paxil was helping her anxiety, but Scott felt more depressed due to pain.  The doctor noted Scott was limping on the right side, and transferred to the chair slowly.  An x-ray of her right hip revealed no abnormalities.  By August 2008, her gait was normal but she was complaining of numbness and tingling in her left wrist and hand.  Dr. Chen gave her an ACE wrap, and suggested rest, ice and elevation.  He increased her Paxil to help treat her anxiety.  Scott's last appointment with Dr. Chen, in September 2008, was for cold symptoms.

In May 2009, Scott went to the emergency room at OHSU complaining of abdominal pain.  After a CT scan of her chest, she was suspected of having mediastinal lymphadenopathy[1] and sarcoidosis.[2]

Scott established care at the Pearl Health Center in June 2009, seeking treatment for her thyroid disorder, sleep problems, and back pain.  She noted that treatment had "for the most part" been helpful for her depression.  Tr. 558.  She also reported her visit to the ER and the diagnoses she received, as well as a five year history of fibromyalgia.  The intake note indicated that Scott had been discontinued from the last practice because she missed appointments.  Pearl Health Center providers Inge Hindel, M.D., and Patti Brandon, FNP, declined to prescribe narcotics for fibromyalgia, but continued to prescribe Nortriptyline, Flexeril, Paxil, naproxen, and Scott's synthetic thyroid medication.  From December 2009 through October 2010, Brandon encouraged Scott to get regular exercise, change her diet and her body mechanics, and referred her to a specialist for her thyroid problems.  In May 2010, specialist Hyun S. Suh, M.D., who noted Scott had been noncompliant with her thyroid medication for some time, emphasized the importance of taking the thyroid medication consistently.

When Scott complained of shoulder pain in June 2010, Brandon suggested conservative treatment.  An x-ray of the shoulder was normal.  At Scott's July visit, Brandon noted Scott did not mention problems with activities of daily living, Scott reported feeling fine, and on

---

[1]This is "abnormal enlargement of the lymph nodes" in "the space in the chest between the pleural sacs of the lungs[.]"  www.merriam-webster.com/medlineplus/lymphadenopathy and www.merriam-webster.com/medlineplus/mediastinum (last visited 11/10/2015).

[2] This is "a chronic disease of unknown cause that is characterized by the formation of nodules resembling true tubercles especially in the lymph nodes, lungs, bones, and skin[.]" www.merriam-webster.com/medlineplus/sarcoidosis (last visited 11/10/2015).

examination she displayed normal strength and minimal pain with resisted flexion or extension. At her October 2010 visit, Scott complained of fatigue, irritability and depression. Brandon refilled Scott's Nortriptyline prescription and recommended regular aerobic exercise.

Scott changed to Amanda Bauler at the Pearl Health Center in April 2011, who treated Scott until November of that year. Scott reported "living with the pain" in her back since Brandon would not prescribe Vicodin. Tr. 623. Bauler gave Scott specific recommendations for weight loss, recommended Melatonin for sleep problems, and checked Scott's thyroid levels. At her appointment in June, Scott reported she had not made the nutritional changes to her diet suggested by Bauler, had not tried the Melatonin, and did not remember getting a prescription for her thyroid so had not been taking the increased dose of her medication. Scott asked about having another baby and said she would be willing to pay for fertility treatments out of pocket. When Scott demanded an MRI for her back pain in August, Bauler noted slightly decreased range of motion, full flexion, negative straight leg raise, but tenderness along the thoracic and lumbar spine with muscle tension. Bauler explained that conservative treatment was warranted, rather than an MRI, due to the absence of radiculopathy. Scott reported worsened back pain in November 2011, "to the point where housework is even difficult[.]" Tr. 615. Bauler told Scott the reasons for avoiding narcotic pain medication to treat her back pain. Instead, Bauler referred Scott to physical therapy, encouraged icing, supportive shoes, and referred her to ENT for balance diagnosis and treatment.

Scott switched primary care providers, establishing care in February 2012 with Moniquea Degan, FNP, at OHSU, where she remained until November 2013. Scott informed Degan that her prior care provider at Pearl Health Center was "overwhelmed." Tr. 672. Scott reported her

back hurt so much she could not stand long enough to load dishes, and her depression and anxiety made her feel like she could not stay in her own skin.  Degan prescribed Clobenzaprine for muscle spasms and Naproxen.  Degan thereafter treated Scott's tendonitis, gynecological needs, and wrist pain when she fell and was believed to have fractured her wrist.  Scott complained of hearing loss, which was treated with an ear lavage; a hearing test was normal in October 2012.  When Scott complained of joint pain in her big toe radiating up her leg in February 2013, Degan prescribed Gabapentin.  At her May appointment, Scott demonstrated a steady gait and normal strength, sensation, and range of motion.  She reported numbness in her feet at her July appointment, which was thought to be due to having run out of Gabapentin three weeks before.  Scott left her November 2013 appointment early due to anxiety, but returned a few weeks later complaining of stomach flu and balance problems.  She displayed normal strength, sensation, and range of motion, was able to stand for 2 to 3 seconds on one foot (equal bilaterally), and hold for 10 to 15 seconds with Romberg testing.  Degan completed a form for the apartment manager opining that Scott needed to use a grocery cart for her groceries and laundry.

Scott received counseling from LifeWorks NW beginning in January 2010.  She was diagnosed with major depressive disorder and panic disorder without agoraphobia.  At her appointments in 2010, she described feeling anxious around strangers, lack of self care, and relying on her children to clean the house.  She thought her depression and anxiety were related to her chronic pain.  She started planning to move in October 2010, and was working on getting out of the house a couple times per week, but was feeling exhausted.  She moved in early 2011 and was cleaning and organizing her new apartment in February 2011, although she was noting

new obsessive compulsive behaviors.  At her October and November 2011 appointments, Scott

reported feeling okay, attending a cooking group with her daughter, and wanting to interact with

people.  Keeping her house clean was difficult for her in December, but she had done it.  Scott

cancelled or walked out of a spate of appointments the first half of 2012, but presented in a

positive mood in July 2012.  Scott missed her August appointment, but was engaged and

talkative in September.  She was exercising, had changed her diet, and was involved at her

daughter's school.  Scott missed her next three appointments, but showed up in April 2013

despite high anxiety traveling alone downtown.  At her May appointment, she reported traveling

home by herself one day, and walking around downtown another.  She was dealing with learning

some painful information about family members.  She missed her next two appointments.  At her

October 2013 appointment, she refused to sign a behavior contract to address missing

appointments; she left the office abruptly.  In November, her therapist called and left a message

explaining that Scott left without signing the behavior contract, which demonstrated to the

therapist that Scott was not interested in the treatment LifeWorks offers.

## DISCUSSION

I.      Scott's Credibility

Scott testified that she could not work due to her balance and memory problems.  She

also reported pain in her lower back, hip area, and between her shoulder blades, and testified to

feeling anxious and irritable.

Scott contends the ALJ articulated only two reasons for questioning the intensity of her

pain and other symptoms:  daily activities and the fact that no treating or examining physician

had described Scott as disabled or identified limitations greater than those the ALJ proposed in the RFC.

The Commissioner contends the ALJ gave other reasons as well, such as:  Scott stopped working for reasons other than her impairments; Scott received conservative treatment; and Scott had a history of noncompliance with physician advice.  In her reply, Scott urges me to ignore the Commissioner's argument, suggesting I am precluded from speculating about the ALJ's rationale because the ALJ failed to articulate these reasons in his opinion.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  *Id.*  The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony."  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).  General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence.  *Id.*  "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making

specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).[3]

I find the ALJ clearly demarcated three reasons in his credibility analysis:  Scott's activities of daily living are inconsistent with an inability to work, medical records do not support the level of limitation to which she testified, and the lack of a disability opinion from a treating or examining source.  The Commissioner does not defend the ALJ's statement that no treating or examining doctor opined on Scott's disability because there were doctors who identified greater limitations than those accepted by the ALJ.  Further, as Scott points out, her daily activities are fairly limited and not necessarily inconsistent with her claims of inability to work.  However, as the ALJ noted, Scott indicated a desire to have a baby, which the ALJ could properly view as inconsistent with Scott's testimony about lack of energy and physical pain.  Similarly, the ALJ noted Scott's testimony that her limitations keep her from doing much more than washing the dishes, when "the medical records do not show this level of limitation."  Tr. 19.  Although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects.  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); Tr. 432, 433, 430, 429 (imaging ordered by Dr. Chen revealed no abnormal findings in hips, hands, ankle, brain, elbow, or knee); *see also* Tr. 520, 626 (Brandon encouraged nutritional changes and

---

[3] The Commissioner suggests the clear and convincing standard need not control the analysis, encouraging application of the more deferential regulatory requirement for specific reasons supported by substantial evidence.  Def.'s Br. 4, n.1.  The Ninth Circuit has rejected her argument.  *See Burrell v. Colvin*, 775 F.3d 1133 (9th Cir. 2014) (reasserting that the ALJ must provide "specific, clear and convincing reasons" to support a credibility analysis).

aerobic exercise); Tr. 624, 618 (Bauler recommended weight loss and conservative treatment); Tr. 672, 632-671 (despite complaining of intense back pain at Feb. 2012 visit, Degan did not note back pain complaints).  Relatedly, the ALJ specifically commented that Scott's impairments have "justified mostly conservative treatment."  Tr. 19; *Parra*, 481 F.3d at 750-51 (evidence of conservative treatment is sufficient to discount a claimant's testimony on the severity of an impairment).

In addition, while it is a closer call, I find the ALJ also identified three other reasons with sufficient specificity to satisfy the legal standard.  For example, the ALJ noted, "The claimant said she ended full-time work to focus on raising her children."  Tr. 18.  The ALJ also referenced Scott's failure to follow prescribed treatment, missed medical appointments, and failure to comply with her medication regime.  Failure to follow a prescribed course of treatment is a clear and convincing reason to question Scott's credibility.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (unexplained failure to seek treatment or to follow a prescribed course of treatment is a credibility factor); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (same). The ALJ did not merely summarize the medical evidence, or bury these comments in the medical history, but rather gave sufficiently specific reasons to ensure Scott's testimony was not arbitrarily discredited.  *See Brown-Hunter v. Colvin*, __ F.3d __, 2015 WL 6684997, at *6 (9th Cir. Aug. 4, 2015).

Finally, the fact that the ALJ improperly considered some reasons for finding Scott's credibility undermined (the purported lack of a doctor's opinion on limited functioning and, to some extent, daily activities) does not mean the ALJ's entire credibility assessment is improper. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004).  The ALJ gave

sufficient clear and convincing reasons, supported by substantial evidence in the record, to find Scott less than fully credible about the extent of her symptoms.

II.    Lay Testimony

Scott's husband, James Scott, submitted a third-party function report. He helps Scott with shopping, lunches, and driving her to therapist appointments. Scott cannot spend very much time on her feet, and has anxiety attacks around strangers, groups of people, and on public transportation. Her son helps with the housework. She shops one or twice a month.

The ALJ found Mr. Scott's statement to be credible, but that Scott listed more daily activities than those identified by Mr. Scott. As a result, the ALJ thought Scott had fewer limitations than Mr. Scott suggested.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. *Stout v. Commissioner of Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). As I concluded above, the daily activities reported by Scott do not demonstrate her ability to work; further, the two reports from the Scotts are fairly consistent with each other. However, since the ALJ discussed Scott's testimony and gave clear and convincing reasons for rejecting it, and since Mr. Scott's report was consistent with Scott's own testimony and the same reasons would apply, I conclude any error the ALJ made in addressing Mr. Scott's testimony would not have changed the outcome of the case. *See Molina*, 674 F.3d at 1122. As a result, any error was harmless.

III.    Medical Evidence

Scott challenges the ALJ's treatment of the opinions of treating physician Dr. Chen and examining psychologist Dr. Spendal. The weight given to the opinion of a physician depends on

whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066.

The parties dispute the applicable standard–whether clear and convincing or specific and legitimate.  I address each doctor separately.

A.    Dr. Chen

Dr. Chen's last appointment with Scott was in September 2008.  Tr. 414; Tr. 608 ("Has no longer been a patient of mine since 9/2008").  He wrote a letter on her behalf almost two years later, in July 2010, identifying the following limitations:  lifting no more than 10-15 pounds; no repetitive bending and twisting, no sitting, standing or walking for longer than two hours at a time.  He thought she remained able to handle objects, hear, speak, and engage in work-related mental activities so long as she was not in close quarters.[4]

---

[4] Dr. Chen also completed a Mental Residual Functional Capacity report in December 2009, to which the ALJ gave little weight for the reasons that it was incomplete and addressed only part of the relevant time.  Tr. 22.  Plaintiff's reply seems to confuse the two opinions, but she  does not challenge the ALJ's rejection of Dr. Chen's opinion on her mental limitations.

The ALJ gave Dr. Chen's opinion some weight to the extent it was consistent with the RFC, but commented Dr. Chen had not treated Scott for much of the relevant period. In addition, Scott testified she no longer struggled with claustrophobia. Scott argues that the RFC does not account for her lifting and carrying limitations or the limitation on bending and twisting. She asserts that adding these limitations to the RFC would erode the sedentary occupational base.

Since Dr. Chen's opinion about Scott's positional and lifting limitations is inconsistent with the opinion of state agency consultant J. Scott Pritchard, D.O., the ALJ was required to give specific and legitimate reasons to support the weight he gave to Dr. Chen's opinion. *See* Tr. 121.

As the Commissioner points out, the ALJ limited Scott to sedentary work, which is defined as requiring lifting no more than 10 pounds at a time. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) ("Sedentary work involves lifting no more than 10 pounds at a time[.]"). As a result, Scott's argument that the ALJ did not account for her lifting limitation is not supported by the record. Scott relies on a policy statement applicable to an individual "unable to lift 10 pounds." SSR 96-9p, 1996 WL 374185, at *6. This policy does not apply here as Dr. Chen restricted Scott from "heavy lifting (no more than 10-15 pounds)[.]" Tr. 511.

With respect to Dr. Chen's restriction on bending and twisting, which is not accounted for in the RFC, the ALJ properly concluded Dr. Chen's opinion was not persuasive beyond the time he treated Scott. Nevertheless, as Scott argues, it is certainly relevant to a portion of the period at issue. The other reason the ALJ gave–the fact that Scott no longer struggled with claustrophobia–is irrelevant to Scott's positional restrictions. Accordingly, the ALJ failed to give a specific and legitimate reason to reject this portion of Dr. Chen's opinion.

Nevertheless, as the Commissioner points out, Scott does not explain how the error is harmful. The Commissioner notes neither occupation identified by the VE (surveillance system monitor and addresser) lists bending or twisting as a positional requirement. For that reason, any error the ALJ made was harmless to the outcome of the case. *Molina*, 674 F.3d at 1115 (citing cases where RFC error was harmless).

B.    Dr. Spendal

Dr. Spendal examined Scott in August 2006 at the agency's request. After extensive testing, Dr. Spendal reported Scott's intellectual functioning was largely average, with weaknesses in attention, concentration, and impulse control. Dr. Spendal suggested a "moderate but consistent pace of presentation will hold her focus best." Tr. 366. Dr. Spendal diagnosed ADHD. Dr. Spendal did not think Scott met the full criteria for panic disorder or generalized anxiety disorder, but thought she had enough symptoms to diagnose Anxiety NOS. In addition, while the doctor did not have enough information for a more specific diagnosis, Dr. Spendal diagnosed Depression NOS given the symptoms Scott reported. The doctor listed ten "General Accommodations," 13 "Employment Accommodations," a handful of "Educational Accommodations," eight "Recommendations," and 12 further "Recommendations for Tammy."

Dr. Spendal's suggested accommodations and recommendations were contradicted by agency consultant Joshua J. Boyd, Psy.D. Dr. Boyd concluded Scott would be "able to concentrate sufficiently to perform simple tasks. . . . Some evidence of distractibility but this would not interfere with the ability to complete a normal workday/workweek performing simple

tasks with scheduled rest periods." Tr. 123. As a result, the ALJ was required to give specific

and legitimate reasons to give Dr. Spendal's opinion on Scott's functioning less weight.[5]

In his first opinion, as the Appeals Council noted, the ALJ gave significant weight to Dr.

Spendal's opinion, but erred as follows: "Dr. Spendal provided a list of employment

accommodations that would be necessary due to the claimant's attention and impulse control

issues. However, the decision does not address these accommodations or provide specific

reasons for rejecting them. Further consideration of Dr. Spendal's opinion is needed." Tr. 161.

On remand, the ALJ noted the following:

> Dr. Spendal provided a series of accommodations and recommendations for the
> claimant. Dr. Spendal wrote, "the following recommendations and
> accommodations are suggested to help Tammy be her most successful." . . . These
> recommendations and accommodations include providing extra time for testing
> and to meet deadlines; additional, short breaks throughout the day (to maintain
> attention and concentration); giving instructions in written and oral forms;
> providing written reminders; repeating instructions and other important
> information; teaching with both visual and auditory tools; allowing the claimant to
> record instructions; making lists; and providing information piece-by-piece. Dr.
> Spendal also recommended that the claimant receive summaries and extra
> feedback. Supervisors should reiterate information, allow for errors after change,
> and involve the claimant in the full task completion process (instead of being part
> of the beginning or the end of a task only). The claimant should use a day planner
> or an electronic organizer; she would need a medication evaluation and short-term
> therapy. The claimant should also learn to advocate for herself, have sleep aids
> for insomnia, and educate herself about attention deficit disorder.
>
> The testing and examination portion of Dr. Spendal's analysis receives significant
> weight, as it is based on accepted measures of cognitive functioning and is
> consistent with claimant's activities of daily living. Dr. Spendal's suggested
> accommodations and recommendations receive only some weight, however. Dr.
> Spendal said these items were "suggested" to help make the claimant "her most

---

[5] Dr. Chen also noted in December 2009 that Scott had only moderate limitations in
understanding, remembering and carrying out detailed instructions, and a moderate limitation in
maintaining attention and concentration for extended periods; in July 2010 he reported Scott had
no work-related mental restrictions.

successful." She did not state that the claimant would be incapable of all work without these accommodations and recommendations. She did not say the claimant would require a sheltered work environment. The recommendations and accommodations amount to a best-case scenario for success in a perfect work environment. Dr. Spendal made these lists in 2006, and the claimant has received conservative treatment since that time. The claimant's activities of daily living show fewer limitations than Dr. Spendal suggested. Some mental health symptoms improved, as the claimant testified that claustrophobia no longer disturbed her. The residual functional capacity allows for many of Dr. Spendal's proposals by limiting the claimant to simple, repetitive tasks consistent with unskilled work.

Tr. 21-22. Contrary to Scott's assertion, then, the ALJ did not fail to comply with the Appeals Council's order; he directly addressed the entirety of Dr. Spendal's opinion.

Scott insists the Appeals Council already concluded the list of accommodations "would be *necessary* due to the claimant's attention and impulse control issues" so that the ALJ's rejection of those "necessary" accommodations violated the essence of the Appeals Council's order. However, since the Appeals Council anticipated that the ALJ would reject the accommodations and recommendations (so long as he provided specific reasons in support of his rejection), the Appeals Council could not have intended to direct the ALJ to consider the accommodations integral to Scott's employment success.

Scott disagrees with the ALJ's characterization of the accommodations as "best case scenario" proposals, arguing they are "obstacles to successful employment" instead. Pl.'s Reply 4. However, the ALJ's interpretation is rational; after all, Dr. Spendal introduced the accommodations and recommendations as suggestions "to help Tammy be her most successful." Tr. 368. Indeed, many of the accommodations are phrased as "could benefit" and "may need." *Id.* An ALJ does not err by excluding recommendations from the RFC. *Valentine v. Comm'r*

*Soc. Sec. Admin.*, 574 F.3d 685, 691-92 (9th Cir. 2009) (notation in "Recommendations" was not an opinion that claimant was incapable of working except under those conditions).

While I am not convinced Scott's daily activities are inconsistent with Dr. Spendal's opinion, or that Scott's lack of claustrophobia is relevant, the ALJ did point out the examination occurred in 2006 and Scott had received conservative treatment for her mental health symptoms since then. The inconsistency between Dr. Spendal's recommendations and the kind of treatment Scott received is a specific and legitimate reason to disregard some of Dr. Spendal's recommendations and accommodations. In short, substantial evidence supports the ALJ's conclusions about Scott's limitations, and the ALJ provided specific and legitimate reasons to reject the more restrictive recommendations and accommodations outlined by Dr. Spendal.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this  23rd  day of November, 2015.


 /s/ Garr M. King

Garr M. King
United States District Judge